**EXHIBIT 5**

# In The Matter Of:

## *MEGGITT (SAN JUAN CAPISTRANO), INC.*
### *v.*
### *NIE YONGZHONG*

---

## *YOUNG, ROBERT D. - Vol. 1*
### *March 12, 2015*

---

**MERRILL CORPORATION**

**LegaLink, Inc.**

20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

**EXHIBIT 5 - PAGE 44**

ROBERT D. YOUNG - 3/12/2015

Page 41

```
 1      Q    And was that a telephone conversation?

 2      A    Yes.

 3      Q    In November of 2014?

 4      A    No.  I think it was prior to that, but I don't

 5   recall when.

 6      Q    Do you recall how much prior to November 2014

 7   that telephone conference happened?

 8      A    No.

 9      Q    Do you recall anything about that conversation

10   other than you were asked to look at a hard drive for

11   access, certain files?

12      A    No.

13      Q    What was the next activity in this case that

14   occurred after that telephone conference?

15      A    I think we received a copy of the hard drive

16   image.

17      Q    Going back to this telephone conference, was

18   anybody on the phone call other than yourself and

19   Ms. Castro [sic]?

20      A    It's "Casto."

21      Q    Casto.  Sorry.

22      A    And I don't recall.

23      Q    Were you provided any information about the

24   drive itself?

25           MS. CASTO:  Objection; vague and ambiguous.
```

**EXHIBIT 5 - PAGE 45**

ROBERT D. YOUNG - 3/12/2015

```
 1              THE WITNESS:  Nothing specific that I recall

 2     other than it was in China.

 3     BY MR. KERTELL:

 4         Q   Were you provided any information about where

 5     in China it was located?

 6         A   Not that I recall.  I may have, but I don't

 7     recall.

 8         Q   Any information about where this drive

 9     originated from?

10         A   I don't understand the question.

11         Q   You mentioned that you were in a conversation

12     where you were asked to look at a hard drive for access

13     of certain files.  You have mentioned that the hard

14     drive -- you were told that the hard drive was in China.

15              Were you provided any other information about

16     the drive?

17         A   Yes.

18         Q   And what was that information?

19         A   Just the drive had some files that were put on

20     it; that somebody had the drive and that was the drive

21     that I was -- an image had been made of the drive and

22     that I was going to look at the image of the drive

23     rather than the drive itself.

24         Q   Were you told who had the drive?

25         A   Yes.
```

**EXHIBIT 5 - PAGE 46**

ROBERT D. YOUNG - 3/12/2015

```
 1        Q    And who were you told had the drive?

 2        A    Morgan, Lewis had the drive.

 3        Q    Were you told where Morgan, Lewis had received

 4   the drive from?

 5        A    Probably, but I don't recall at that time.

 6        Q    Were you told who made the image of the drive?

 7        A    Yes.

 8        Q    And who made the image of the drive, or who

 9   were you told made the image of the drive?

10        A    That I believe Kroll had sent someone there to

11   do the drive image.

12        Q    When you said "there," you mean China?

13        A    To Morgan, Lewis's offices in China, yes.

14        Q    And do you know when some individual from Kroll

15   went to Morgan, Lewis's offices in China to make a copy

16   of the drive or an image of the drive?

17        A    Not as I sit here, no.

18        Q    You said as you sit here.

19             Do you know?

20        A    I believe there are records that Kroll keeps.

21        Q    Were those records ever provided to you?

22        A    Recently, yes.

23        Q    And what records were those?

24        A    Kroll chain-of-custody forms.

25        Q    And when did you receive them?
```

**EXHIBIT 5 - PAGE 47**

ROBERT D. YOUNG - 3/12/2015

```
 1       A    A couple of days ago.

 2       Q    Do you know if they have ever been produced in

 3   this case?

 4       A    No, I do not.

 5       Q    Okay.  After this initial telephone

 6   conversation that you believe was prior to November

 7   2014; is that correct?

 8       A    Yes.

 9       Q    What was your next activity in this case?  Is

10   that when you received the drive itself?

11       A    Received it sometime after the phone call.

12       Q    The image copy?

13       A    Yes.  It was a drive that had the image copy on

14   it.

15       Q    Did you have any conversations with anybody

16   about this case or the drive before receiving it other

17   than your conversation with Ms. Casto?

18       A    No.

19       Q    And when did you receive the drive?

20       A    I don't recall the specific date.

21       Q    Can you give any approximation when you

22   received it?

23       A    Prior to November.  That's -- I don't recall

24   the dates.

25       Q    And what did you do once you received the
```

**EXHIBIT 5 - PAGE 48**

ROBERT D. YOUNG - 3/12/2015

```
 1   drive?

 2        A   Looked at it to verify it was readable, and

 3   that was about it.

 4        Q   And what was your next action with respect to

 5   this case after you looked at the drive and verified

 6   that it was readable?

 7        A   At some point later, we were given the task to

 8   specifically look for specific files and whether or not

 9   they had been accessed.

10        Q   Did you have any conversations with anybody at

11   Morgan, Lewis between the time you looked at the drive

12   and found it to be readable and when you were later

13   asked to look at it to see if files had been accessed?

14        A   Could you repeat that question.

15        Q   Okay.  Let's just go back here.

16            You said you received a copy of the drive some

17   time prior to 2000 -- November 2014; correct?

18        A   Yes.

19        Q   And you said, when you received the drive, you

20   looked at it to verify that it was readable; correct?

21        A   Yes.

22        Q   Was that also done prior to November of 2014?

23        A   Yes.

24        Q   Was that done at the same time you received the

25   drive or sometime thereafter?
```

**EXHIBIT 5 - PAGE 49**

ROBERT D. YOUNG - 3/12/2015

1        A    Shortly thereafter.

2        Q    What was your next communication with anybody

3    about this case?

4        A    The November time frame, or thereabouts,

5    indicating that the case was proceeding and that I would

6    need to start analyzing the drive.

7        Q    Okay.  And when did you start analyzing the

8    drive?

9        A    Sometime in that time frame.  I believe

10    November.

11        Q    And what did you do to analyze the drive?

12        A    Reviewed the contents of the drive.

13        Q    What do you mean by "reviewed the contents of

14    the drive"?

15        A    Doing data-recovery work on the drive to make

16    sure everything was visible, calculating hash values for

17    all of the files on the drive, comparing them against

18    the hash values that were provided to me by counsel for

19    files identified by Dr. Shkel, and then -- and then

20    basically verbally reporting my results at that point.

21        Q    And at what point did all these activities

22    occur?

23        A    Somewhere towards the end of the year.  I do

24    not recall the specific dates.

25        Q    Did you have any contact with anybody at

**EXHIBIT 5 - PAGE 50**

ROBERT D. YOUNG - 3/12/2015

1    Morgan, Lewis during this time when you were proceeding

2    with these steps?

3        A    Yes.

4        Q    And when were those conversations?

5        A    During that time period, I talked to Ms. Casto

6    to obtain information about the materials.  I also

7    talked to other people at Morgan, Lewis about the other

8    cases we were working on.  That's why I hesitated on

9    answering the question.

10       Q    Any other conversations you were having with

11   Morgan, Lewis relating to this case?

12       A    That's not what you said.

13       Q    No, I'm asking a new question.

14       A    Thank you.

15            MS. CASTO:  So what's the question?

16            THE WITNESS:  Yeah, it's kind of buried there.

17            MR. KERTELL:  Well, let's go back here.

18       Q    When were you provided hash values by Morgan,

19   Lewis?

20       A    I believe in November.  May have been October,

21   but I want to say November.

22       Q    And who provided you with those hash values?

23       A    Ms. Casto, or one of her associates e-mailed

24   them to me.

25       Q    Did you request those hash values?

**EXHIBIT 5 - PAGE 51**

ROBERT D. YOUNG - 3/12/2015

Page 48

1        A    I don't recall if I asked for them or if it was

2    provided.   It was part of the analysis, so they were

3    necessary.

4        Q    And after you provided the -- you mentioned the

5    verbal report; is that correct?

6        A    Yes.

7        Q    And when did you provide that verbal report?

8        A    Sometime before I wrote the report, a written

9    report.

10       Q    And who did you provide the written report to?

11       A    Ms. Casto.

12       Q    And what was the content of that report?

13       A    Just the summary of what I had; that none of

14   the files identified -- there's no evidence on the drive

15   that any of the files identified by Dr. Shkel had been

16   accessed after at that point.  I think I just said

17   August.  I don't recall if I specified the specific

18   date.

19       Q    Have you ever spoke to Mr. Nie?

20       A    No.

21       Q    Have you ever spoken to anybody at Niell-Tech?

22       A    No.

23       Q    What did you do on this case after providing

24   the verbal report?

25       A    Produced the exhibits and the final report, the

**EXHIBIT 5 - PAGE 52**

ROBERT D. YOUNG - 3/12/2015

```
 1   written report.
 2        Q    Approximately how much time did you spend on
 3   this project in total?
 4        A    I don't recall the numbers specifically, no.
 5        Q    What's your best approximation?
 6        A    Under 20 total.  Let me back that up; that I
 7   billed for under 20.  I may have spent more time.
 8        Q    Approximately how much more time did you spend
 9   than you billed?
10        A    Maybe another 25, 30 percent.
11        Q    How are you being compensated for your work on
12   this case?
13        A    Johnson-Laird is -- paid for my efforts.
14        Q    And what is the rate that you are being
15   compensated at?
16        A    450 an hour.
17        Q    Is that the same for deposition and trial time?
18        A    Yes.
19        Q    Did you have anybody from Johnson-Laird assist
20   you on this project?
21        A    Yes.
22        Q    Who?
23        A    Margaret Anderson is our evidence intake
24   specialist.  She records and catalogs what we received,
25   and a Mr. Don Cushing, who is our IT guy who created the
```

**EXHIBIT 5 - PAGE 53**

ROBERT D. YOUNG - 3/12/2015

```
 1    copy that was produced -- or a copy for ourselves so the

 2    original could be returned.  I don't recall which one

 3    happened, but I know that, recently, we were asked to

 4    produce the copy we had, and whether we sent a copy or

 5    the original, I don't recall.

 6        Q    Do you recall what time period this was?

 7        A    Back in January.  That's a question mark.  I

 8    don't recall the specifics.

 9        Q    So this would be a copy of the copy?

10             MS. CASTO:  Objection; asked and answered.

11             THE WITNESS:  A copy of what we received was

12    made.  I do not recall the disposition.

13    BY MR. KERTELL:

14        Q    Was there anybody else involved besides

15    yourself, Ms. Anderson, and Dr. Cushing?

16        A    It's not doctor.  It's Don Cushing.

17        Q    Sorry, Cushing.

18        A    No.

19        Q    Do you know where the original hard drive is?

20        A    Not as I sit here, no.

21        Q    Have you ever known where the original hard

22    drive is?

23        A    Personally, no, but Ms. Casto told me that it

24    was at the Morgan, Lewis's offices in China, but I've

25    never seen it, so.
```

**EXHIBIT 5 - PAGE 54**

ROBERT D. YOUNG - 3/12/2015

Page 55

```
 1      A    No.

 2      Q    Would that have been at all relevant to your

 3  opinions in this case?

 4      A    No.

 5      Q    Why not?

 6      A    Because my opinion is that no files were

 7  accessed -- none of the files identified by Dr. Shkel

 8  were accessed after August 9th, 2011.

 9      Q    You have no opinion if any of the files were

10  accessed prior to August 9, 2011; correct?

11      A    That's correct.

12      Q    Were any of the files accessed prior to

13  August 9th, 2011?

14      A    There were files that were accessed prior to

15  that date, yes.

16      Q    Do you have any other knowledge other than what

17  you have stated today about the original hard drive?

18      A    No.

19      Q    Do you know where it presently is today?

20      A    Not personally, no.

21      Q    What is an external hard drive?

22      A    It's a storage device that's connected to

23  another computer via an -- well, what we call external

24  ports, such as FireWire, USB, serial port, parallel

25  port, any number of methods as opposed to a drive that's
```

**EXHIBIT 5 - PAGE 55**

ROBERT D. YOUNG - 3/12/2015

1    built into the computer.

2        Q    What information did you rely upon to describe

3    the drive that is the subject of your report as an

4    external hard drive?

5        A    That's what was represented to me about the

6    drive; plus, the data on the drive was consistent with

7    that.

8        Q    And when was it represented to you that this

9    was an external hard drive?

10       A    I believe during the initial phone call.

11       Q    Okay.  That was the pre-November 2014 phone

12   call with Ms. Casto?

13       A    Yes.

14       Q    Was that important knowledge to know, that it

15   was an external hard drive?

16       A    Not for the purposes of my analysis, no.

17       Q    When did Mr. Nie first have this hard drive?

18       A    I don't know.

19       Q    Do you have any personal knowledge that Mr. Nie

20   ever had this hard drive?

21       A    Not personally, no.

22       Q    Why didn't you ever talk to Mr. Nie?

23       A    It wasn't relevant to my opinion.

24       Q    So you didn't think it was important to ever

25   speak to him; is that correct?

**EXHIBIT 5 - PAGE 56**

ROBERT D. YOUNG - 3/12/2015

Page 57

```
 1              MS. CASTO:  Objection; vague, ambiguous.

 2              MR. KERTELL:  Let me restate that question,

 3    then.

 4        Q    Did you think it was important to speak to

 5    Mr. Nie?

 6        A    No.

 7        Q    Did you think it was important to speak to

 8    anybody at Niell-Tech?

 9        A    No.

10        Q    You referred to the -- I believe the image copy

11    in your report as a LaCie external hard drive; is that

12    correct?

13        A    I believe that's what I was told.

14        Q    And who were you told that by?

15        A    Ms. Casto.

16        Q    And when was that?

17        A    Sometime prior to the writing of the report.

18        Q    And what was the relevance of that information?

19        A    It's just a manufacturer, more specific about

20    it as opposed to any other external hard drive.

21        Q    And that was represented to you by Ms. Casto,

22    that that was the manufacturer of the original hard

23    drive?

24              MS. CASTO:  Objection; misstates his testimony.

25              THE WITNESS:  I don't recall whether it was
```

**EXHIBIT 5 - PAGE 57**

ROBERT D. YOUNG - 3/12/2015

1    who receives these materials.

2        Q    Would that mean that you -- if this image drive

3    is assigned a date of July 18, 2014, would that mean

4    that your initial conversation with Ms. Casto occurred

5    prior to that date?

6        A    Maybe.  I don't recall whether that date is --

7    does it say "Date Received" in the report, or is it date

8    on the media?  Sometimes we get a date on a media which

9    would be somebody else's date as opposed to our received

10   date, and I don't recall what I put in the report.

11       Q    What is a "cryptographic hash function"?

12       A    A "cryptographic hash function" is a hashing

13   value -- calculating a hashing value that uniquely

14   identifies something while not revealing its content.

15       Q    And how does a cryptographic hash function

16   calculate a unique value number for each file?

17       A    Well, without going into the details, by

18   specifically considering every 1 and 0 inside a file.

19       Q    And is that number a hash value?

20       A    The result is the hash value.  The considering

21   is the hashing function.

22       Q    Did you review the contents of any of the files

23   on the image copy you were provided?

24       A    Yes.

25       Q    And why did you use that?

**EXHIBIT 5 - PAGE 58**

ROBERT D. YOUNG - 3/12/2015

Page 63

1       A    Specifically to look at some of the files that

2   were accessed after August 2011 to determine what they

3   may or may not have been.

4       Q    And why did you do that?

5       A    Because there were files that were accessed

6   after August 2011.

7       Q    And what files were those?

8       A    I believe I produced a list of them, and

9   counsel produced them to you as a spreadsheet, but there

10  were standard out [sic].  There were text files that

11  were part of some programming work.  There was a video,

12  a PowerPoint presentation, a PDF, I think.  Several

13  files -- a few files.  I didn't examine them for any

14  specific -- with any specific depth.

15      Q    Did you look at the content of any other files

16  other than those files that were accessed after

17  August 9th, 2011?

18      A    Could you repeat that?

19      Q    Did you review the contents of any other files

20  other than those which you mentioned were listed on that

21  spreadsheet as being accessed after August 9th of 2011?

22      A    I don't recall.  I may have, but I don't

23  recall.

24      Q    Did you calculate any hash values in this case?

25      A    The software I did -- I used did.

**EXHIBIT 5 - PAGE 59**

ROBERT D. YOUNG – 3/12/2015

Page 64

1       Q    And was that the EnCase software?

2       A    Yes.

3       Q    And what version of EnCase did you use?

4       A    6.19.  6.19, I believe.  I don't recall the dot

5   value.  Dot 7, dot 6, dot 5 -- there have been several

6   sub-releases of EnCase, 6.19, but it's basically a

7   frozen product, so.

8       Q    And what files did you calculate the hash

9   values for using in EnCase?

10      A    All of them.

11      Q    All the files on the drive?

12      A    Yes.

13      Q    And why did you calculate the hash values for

14  all the files in the drive?

15      A    So I identify which ones matched the files

16  identified by Dr. Shkel.

17      Q    Do you have any personal knowledge what files

18  were identified by Dr. Shkel?

19      A    No.

20      Q    So when you say that you matched them against

21  the files identified by Dr. Shkel, you don't have any

22  personal knowledge of that; correct?

23      A    Isn't that the question you just asked?  The

24  answer is I received a list of hash values from

25  materials identified by Dr. Shkel, but I've never read

**EXHIBIT 5 - PAGE 60**

ROBERT D. YOUNG - 3/12/2015

```
 1    his report, no.

 2         Q    And you have no personal knowledge that those

 3    documents were actually identified by Dr. Shkel;

 4    correct?

 5              MS. CASTO:  Objection; asked and answered,

 6    argumentative.

 7              THE WITNESS:  That's correct.

 8    BY MR. KERTELL:

 9         Q    So when you said you compared the hash values

10    to hash values identified -- files identified by

11    Dr. Shkel, you are relying on materials provided to you

12    by counsel; correct?

13         A    Yes.

14         Q    You have no personal knowledge?

15              MS. CASTO:  Objection; asked and answered.

16              THE WITNESS:  That's correct.

17    BY MR. KERTELL:

18         Q    What is the Message Direct 5 -- sorry.

19              What is the Message Direct 5 method?

20         A    It's called "Message Digest 5."

21         Q    Sorry, Message Digest 5?

22         A    Message Digest 5 is a particular algorithm.

23         Q    And why did you -- did you use that particular

24    method -- hashing program -- or method?

25         A    I used that particular method, yes.
```

**EXHIBIT 5 - PAGE 61**

ROBERT D. YOUNG - 3/12/2015

```
 1              THE WITNESS:  I see six items.  Is there seven?
 2    I'm sorry, I'm --
 3              MR. KERTELL:  If we include the external hard
 4    drive.
 5              THE WITNESS:  Yes.  Okay.
 6    BY MR. KERTELL:
 7       Q   Other than the LaCie external hard drive, there
 8    were six pieces of material that were received in
 9    consideration during preparation of the report?
10       A   Yes.
11       Q   Who created these six -- are they documents?
12       A   I believe there were electronic spreadsheets.
13       Q   Okay.
14       A   If you consider that a document.
15       Q   Okay.  So other than the LaCie external hard
16    drive, the other six materials identified here were
17    electronic spreadsheets?
18       A   Yes.
19       Q   Who created these spreadsheets?
20       A   I don't know.
21       Q   Did you create any of them?
22       A   No.
23       Q   How did you come to receive these electronic
24    spreadsheets?
25       A   I believe they were e-mailed to me.
```

**EXHIBIT 5 - PAGE 62**

ROBERT D. YOUNG - 3/12/2015

1        Q    By who?

2        A    By Ms. Casto or her assistant.

3        Q    Was there any descriptions provided with any of

4    these electronic spreadsheets?

5        A    I don't recall if it was verbal or if it was

6    included in the e-mail as to what they were.  I believe

7    the names were self-explanatory.

8        Q    And do you recall what either this written or

9    oral representations were as to what these materials,

10   electronic spreadsheets, were?

11       A    Yes.

12       Q    And what was that?

13       A    That they were the files identified by

14   Dr. Shkel, in some cases as an attachment or an appendix

15   or exhibit -- I don't recall -- and others that were

16   identified in his report but not cited in the

17   attachment.

18            MR. KERTELL:  Okay.  Mark this as Exhibit 2.

19            (Exhibit 2 was marked for identification by the

20            Reporter.)

21            MS. CASTO:  Counsel, did this have a

22   production --

23            MR. KERTELL:  No, it did not.

24            MS. CASTO:  It did not have a production

25   number?  It was not produced to you with a production

**EXHIBIT 5 - PAGE 63**

ROBERT D. YOUNG - 3/12/2015

1       Q    Do you have any idea why the Custodian is

2    listed in some cases "Nie_ Bill Nie_Bill_Laptop" and

3    other times it's indicated as "Nie_Bill"?

4            MS. CASTO:  Objection; asked and answered.

5            THE WITNESS:  Since I didn't create this, I do

6    not know anything about the internals.

7    BY MR. KERTELL:

8       Q    Did all the documents on this spreadsheet come

9    from the hard drive you analyzed?

10      A    Well, no, none of them did that I know of.

11      Q    None of these documents were on the hard drive

12   you analyzed?

13      A    Didn't say that.  I said the items listed in

14   this document did not come from the hard drive.  My

15   understanding was they came from the production copies

16   of Morgan, Lewis.

17           Now, where they came from before that or they

18   related to documents identified by Dr. Shkel, whether

19   they were on the hard drive or not, I can't tell from

20   this spreadsheet.

21      Q    There's a column named "G File Name."

22           Do you have any personal knowledge of what that

23   column represents?

24      A    Personal knowledge, no.

25      Q    What is your understanding, if any?

**EXHIBIT 5 - PAGE 64**

ROBERT D. YOUNG - 3/12/2015

1    that term in your report?

2         A    Anything involved with computers and hard

3    drives and for this particular report.

4         Q    You don't have any tutorial currently in mind

5    for this case, do you?

6         A    Not as I sit here, no.

7         Q    And nothing's been disclosed to Plaintiffs;

8    correct?

9         A    I have no idea what's been disclosed to

10   Plaintiffs.

11        Q    Have you had discussions about a tutorial with

12   counsel for Defendants?

13        A    Not in this matter, no.

14        Q    Okay.  I would like to look at Exhibit 2 to

15   your report.

16        A    Okay.

17        Q    Would you refer to this as a table, or how

18   would you refer to this -- the information that's

19   presented in Exhibit 2?

20        A    Yeah, a table or a list.

21        Q    How is this table created?

22        A    By supporting the information from EnCase and

23   then reformatting it to look a little better.

24        Q    And what information was exported from EnCase?

25        A    Basically all the columns, except the first

**EXHIBIT 5 - PAGE 65**

ROBERT D. YOUNG - 3/12/2015

1    column, come directly from EnCase.

2         Q    Was EnCase provided any information other than

3    that information that's listed in your table as

4    Exhibit 2?

5         A    Oh, yes.

6         Q    What other information is provided by EnCase?

7         A    I'm trying to remember how many, but it's well

8    over 30 columns' worth of data of various summaries,

9    attributes, program-related data, that kind of thing.

10   There's many dozens, at least three or four dozen

11   columns' worth of material.

12        Q    Is any specialized knowledge required to

13   operate the EnCase software?

14            MS. CASTO:  Objection; vague and ambiguous.

15            THE WITNESS:  Yeah, I'm really stuck with that.

16   A monkey could hit buttons.  Well, they know what they

17   want to do.  I don't know.  I don't know how to answer

18   that.  I mean, you can buy the product and use it.  You

19   can take training and use it.

20   BY MR. KERTELL:

21        Q    Can somebody buy EnCase software and create

22   Exhibit 2?

23        A    I did.

24        Q    Could a monkey?

25        A    A really lucky monkey.  I don't know.  I'm just

**EXHIBIT 5 - PAGE 66**

ROBERT D. YOUNG - 3/12/2015

Page 116

 1    saying anybody -- to me, I used it for well over a dozen

 2    years, so I -- to me, it's second nature.  I don't know

 3    what a novice, but I'm assuming a novice would be able

 4    to figure it out.  So can't answer your question as to

 5    what level of expertise is required.

 6         Q    So you have no opinion on what level of

 7    expertise is required in order to operate EnCase

 8    software and obtain the data that's presented in

 9    Exhibit 2; is that correct?

10              MS. CASTO:  Objection; misstates his testimony.

11              THE WITNESS:  That's not correct.  A person

12    would have to have some knowledge of what the columns

13    say, but they can figure that out.  A person would have

14    to have some understanding of what they are looking for

15    and what's available versus just what's displayed on the

16    screen.  So I don't know the level of knowledge that's

17    required to do that, and that's my question, that

18    somebody who knows that information, but not EnCase, be

19    able to use it.  I don't know the answer.

20    BY MR. KERTELL:

21         Q    But all the information would be provided on

22    the screen; correct?

23         A    Pretty much, yes, with the exception of the

24    first P column.

25         Q    And the first column is simply taking the

**EXHIBIT 5 - PAGE 67**

ROBERT D. YOUNG - 3/12/2015

```
 1   earliest date in any of the last three columns; correct?

 2        A    That's not correct.  I guess the most recent

 3   date.

 4        Q    Correct, the --

 5        A    You said "earliest."

 6        Q    Right.

 7             The latest of the three dates in the right

 8   three columns; right?

 9        A    That's correct, yes.

10        Q    Looking at the information in -- at rows 1

11   through 270, are the vast majority of those files PST

12   files?

13        A    I can't answer vast majority without

14   deliberately going through every line to do the

15   arithmetic, but they appear to be -- lots of them appear

16   to be part of a PST.

17        Q    What do you mean by "part of a PST"?

18        A    Are they?  Maybe not.  Maybe not.  Hang on.

19   No.  Part of a -- a PST is a -- PST is a mail archive.

20   It's a storage of individual messages combined into one

21   large file, so when you use program Outlook, it displays

22   hundreds of e-mails for you and the attachments for it,

23   but it's one file, Outlook.PST, or something like that.

24   It's -- depending whatever you want to name it, so it is

25   a file -- a single file called PST that contains within
```

**EXHIBIT 5 - PAGE 68**

ROBERT D. YOUNG - 3/12/2015

1 of these documents that were accessed on July 31st of

2 2011, that's just shortly before the cutoff date of your

3 report of August 9th, 2011?

4    MS. CASTO:  Objection; vague and ambiguous.

5    THE WITNESS:  It appears to be nine days

6 before, yes.

7 BY MR. KERTELL:

8  Q Why did you pick August 9th, 2011, as the

9 cutoff date in your report?

10  A I didn't pick August 9th.

11  Q Why does your report focus on the date of

12 August 9th, 2011?

13  A Because it's my opinion, and it was related to

14 the facts at issue.  The opinion is that none of the

15 files identified by Dr. Shkel present on the hard

16 drive -- that there is no evidence that they had been

17 accessed after that date.  That was the last date of any

18 of the files identified by Dr. Shkel, present on the

19 hard drive, the access date -- the last-accessed date of

20 any of the files identified by Dr. Shkel.

21  Q Again, you have no personal knowledge of what

22 documents were identified by Professor Shkel; correct?

23  A That's correct, no personal knowledge.

24  Q So why do you keep on mentioning that in your

25 opinion?

**EXHIBIT 5 - PAGE 69**

ROBERT D. YOUNG - 3/12/2015

1      A    Because that was the basis of the hash values

2    in the materials I was provided.  That was the purpose

3    and the question I was asked.

4      Q    Based on a representation only by counsel;

5    correct?

6      A    Yes.  I have not read Dr. Shkel's report or

7    seen the exhibits.

8      Q    So you really do not have any idea what

9    documents you looked at; correct?

10          MS. CASTO:  Objection; vague and ambiguous,

11   argumentative, misstates his testimony.

12          THE WITNESS:  That's not true.

13   BY MR. KERTELL:

14     Q    You don't have any idea if the documents you

15   looked at were documents cited by Professor Shkel;

16   correct?

17          MS. CASTO:  Objection; vague and ambiguous.

18          What documents are you referring to?

19          THE WITNESS:  Do you want me to answer?  I

20   mean --

21          MR. KERTELL:  Yes.

22          THE WITNESS:  I know you do.

23          The documents I looked at were based on the

24   representation that the hash values I was given came

25   from documents cited by Dr. Shkel.

**EXHIBIT 5 - PAGE 70**

ROBERT D. YOUNG - 3/12/2015

1   BY MR. KERTELL:

2       Q    Would it be more accurate to say that your

3   opinions are based upon a review of documents you were

4   told by counsel for Defendants were cited by

5   Professor Shkel?

6       A    Yes.

7       Q    So why do you keep on saying that they are

8   documents cited by Professor Shkel when you have no

9   personal knowledge of that?

10      A    Because that's how they were represented to me.

11      Q    And you just take everything that counsel for

12  Defendants tells you at face value; correct?

13          MS. CASTO:   Objection; argumentative.

14          THE WITNESS:   I have no reason to doubt what

15  was represented to me by counsel.

16  BY MR. KERTELL:

17      Q    And you took no action to independently verify

18  that information at all; correct?

19      A    I believe I was prevented from looking at

20  Dr. Shkel's report by Protective Order, but I -- no,

21  I've not looked and taken any independent means.  I did

22  not have access to the documents that were collected in

23  its entirety.  I was given the MD5 values of the

24  documents that were reported to me as cited by

25  Dr. Shkel.

**EXHIBIT 5 - PAGE 71**

ROBERT D. YOUNG - 3/12/2015

```
1        Q    Okay.  I'm looking at your Exhibit 2 to your

2    report, rows 512 through 544.

3             I think in -- all these documents have the name

4    "Wilcoxon" in their path name; is that correct?

5             MS. CASTO:  512 through 544?

6             MR. KERTELL:  Sorry, 515 through 544.

7             THE WITNESS:  It appears that way, yes.

8    BY MR. KERTELL:

9        Q    And from the results of your review, you

10   determined that these were all created en masse on

11   June 16th, 2011; is that correct?

12       A    It appears that way, yes.

13       Q    Okay.

14       A    Maybe, yes.

15       Q    And they were all last accessed on August 1st,

16   2011, according to your Exhibit 2; correct?

17       A    August 1st, yes.

18       Q    And according to your analysis, none of those

19   documents were written after 2007; correct?

20            MS. CASTO:  Objection; vague and ambiguous.

21            After December 31st, 2007, is that what you

22   mean?

23            MR. KERTELL:  After the year 2007.

24            THE WITNESS:  They appear to have dates with

25   2006 and 2007 in them, yes.
```

**EXHIBIT 5 - PAGE 72**

ROBERT D. YOUNG - 3/12/2015

```
 1    BY MR. KERTELL:

 2        Q    So according -- so it's your opinion that those

 3    documents have not been changed since 2006 or 2007;

 4    correct?

 5        A    Yes.

 6        Q    Okay.  Look at documents in rows 557 through

 7    943.

 8             I'm not going to ask you every single one of

 9    them, but are -- the vast majority of those documents,

10    according to your analysis, were created on August 4th,

11    2011?

12        A    From spot-checking, it appears to be that way

13    as I go down them, yes.

14        Q    En masse; correct?

15             MS. CASTO:  Objection; calls for speculation.

16             THE WITNESS:  Yeah, there's a significant

17    number.  Usually I do what's called gap analysis, trying

18    to figure out the distance between times.  I mean, I'm

19    seeing as early as 6:20 or 6:30 through 6:40.

20    BY MR. KERTELL:

21        Q    And I'll represent there's some as late as

22    7:06.

23        A    That's -- I would have to look to see whether

24    the gaps between them -- whether it was one, two, three

25    sessions, as we call it.
```

**EXHIBIT 5 - PAGE 73**

ROBERT D. YOUNG - 3/12/2015

1      Q   And what would be the significance of being in

2   different sessions?

3      A   It would depend on the data.  I would have to

4   look at the size of files.  It could be either because a

5   particular file was so large it took a long time to be

6   accessed or to be created or it could be multiple

7   creation activities.  The one group was copied at once,

8   and then something else had to happen, or the computer

9   did something else and then it went and did a second

10   group.  It would just depend on the size of the spacing

11   of the files.

12      Q   But it's your opinion that roughly 400-plus

13   files listed there from 557 to 943 were copied or

14   created onto the hard drive within a period of a few

15   hours on August 4th, 2011; correct?

16          MS. CASTO:  Objection; misstates the document.

17          THE WITNESS:  I mean, that would be an

18   explanation for these, yes.  I do not know specifically

19   what happened.  I'm just -- the creation dates within

20   the -- that time would be indicative of that.

21   BY MR. KERTELL:

22      Q   And, similarly, the -- for the vast majority of

23   those files, the date you found to be the "Last

24   accessed" date was the same as the "File created" date;

25   is that correct?

**EXHIBIT 5 - PAGE 74**

ROBERT D. YOUNG - 3/12/2015

1       A    I don't know.  I would have to do the analysis

2    for each one.  I did not do that in this case, so on the

3    surface, it appears that way, but I did not do a --

4       Q    So your only concern was what the "File

5    Created," "Last written," and "Last accessed" date were;

6    correct?

7       A    Yes.

8       Q    And that's all you looked at; correct?

9       A    That's --

10          MS. CASTO:  Objection; vague and ambiguous.

11          THE WITNESS:  Well, that's not all I looked at,

12    but it was what I considered for my opinion, yes.

13    BY MR. KERTELL:

14       Q    Why would there be documents -- so many

15    documents created and accessed at the same date and

16    time?

17          MS. CASTO:  Objection; calls for speculation.

18          THE WITNESS:  I have no opinion on why that

19    happened in this case.  I basically was just analyzing

20    what was on there.  I would only be speculating as to

21    the opinion -- the purpose of it.

22    BY MR. KERTELL:

23       Q    That wasn't important to you; correct?

24       A    Not from my opinion, no.

25       Q    You could have talked to Mr. Nie; correct?

**EXHIBIT 5 - PAGE 75**

ROBERT D. YOUNG - 3/12/2015

1       A    I don't know whether I could have or not.

2       Q    You never asked, though, to talk to Mr. Nie;

3   correct?

4       A    That's correct.

5       Q    In your experience, why would large number of

6   documents be created and last accessed at the same time?

7            MS. CASTO:  Objection; calls for speculation.

8            THE WITNESS:  I don't understand the question.

9   BY MR. KERTELL:

10      Q    Well, you reported -- or go back to the

11  beginning here.

12           From your use of EnCase, you determined that

13  the "File created" date for the majority of those

14  documents from 557 to 943 was August 4th, 2011; correct?

15      A    Yes.

16      Q    And you determined, from using EnCase software,

17  that the "Last accessed" date for the vast majority of

18  those documents in 557 to 943 was also August 4th, 2011;

19  correct?

20      A    Yes.

21      Q    So what does it mean that the "File created"

22  and "Last accessed" dates and times are the same?

23      A    That's a different question than what you asked

24  before, but, typically, what that means on a typical

25  hard drive is that when the file is created, the

**EXHIBIT 5 - PAGE 76**

ROBERT D. YOUNG - 3/12/2015

```
 1       A    I have no idea.

 2       Q    Did you ever ask?

 3       A    No.

 4       Q    Why didn't you think it was relevant?

 5       A    Why did I think it was relevant?

 6       Q    Didn't you think it was relevant?

 7       A    No.

 8       Q    Why not?

 9       A    It wasn't relevant to my opinion.

10       Q    What does a "Last accessed timestamp" mean?

11       A    It's the date and time the file was accessed

12  for any reason, some reason.

13       Q    You use the word "touch" in your report; is

14  that correct?

15       A    Yes.

16       Q    Is an example of being touched viewing?

17       A    Yes.

18       Q    Is an example of being touched dragging?

19       A    Yes.

20       Q    Is an example of being touched right-clicking

21  on the file?

22       A    It can be, yes.

23       Q    Are there any other examples of a file being

24  touched?

25       A    I think I described earlier several.  A virus
```

**EXHIBIT 5 - PAGE 77**

ROBERT D. YOUNG - 3/12/2015

1    scanning, defragmenting, searching, the generation of a

2    thumbnail, a generation of an icon.  Those are just some

3    examples.  I mean, there's a lot.

4        Q    Any others, please list them.

5        A    I can't exhaustively list them.  I mean, those

6    are the big ones that I remember.  Yeah, I can't

7    remember the specifics.  I've done experiments in the

8    past and found lots of ways that they change.

9        Q    I'm just asking you to list any one -- any of

10   the ones you can think of.

11       A    I've given them to you.  The ones that I can

12   think of right now.

13       Q    Okay.  So you can't think of any others right

14   now?

15            MS. CASTO:  Asked and answered.

16            THE WITNESS:  Not right now, no.

17   BY MR. KERTELL:

18       Q    Is the file touched when it is copied to

19   another drive or computer?

20       A    Yes.  You are accessing the contents.

21       Q    Are there any instances when a file can be

22   touched using any of the methods you listed and not have

23   the last-accessed timestamp updated?

24            MS. CASTO:  Objection; calls for speculation.

25            THE WITNESS:  Yes.

**EXHIBIT 5 - PAGE 78**

ROBERT D. YOUNG - 3/12/2015

1    BY MR. KERTELL:

2        Q    And what are those?

3        A    Well, I don't have an exhaustive list there

4    either, but I've noticed that it's changed over time as

5    to what constitutes an access by Windows.  Certain

6    versions of Windows changed it, as you pointed out

7    yourself, by simply hovering over, right-clicking, and

8    some of those accesses have not been recorded anymore on

9    later versions of Windows, either Windows 8 or

10   Windows 7.

11       And depends on the maintenance level of the

12   operating system.  Certain versions of Windows 7 did

13   some things, and then later versions changed what they

14   touched or didn't touch.

15       Q    And can you provide me a list of instances

16   where a file could be touched and not have the

17   last-accessed timestamp updated?

18       A    Not a list, but, I mean, the one I recall was

19   the ones I just mentioned; that right-clicking or

20   hovering don't change it on later versions of Windows 7,

21   where, on Windows XP and other versions, you can hover

22   over a file and have the access date change just by

23   hovering.  That doesn't happen under latest versions of

24   Windows that I've used or tested.

25       Q    Any other examples?

**EXHIBIT 5 - PAGE 79**

ROBERT D. YOUNG - 3/12/2015

1      A    Just the one I said about right-clicking.

Other than that, I don't recall any exhaustive tests.

3      Q    Do you have any other instances where a file

4    can be touched and not have the last-accessed timestamp

5    updated?

6           MS. CASTO:  Objection; asked and answered,

7    calls for speculation.

8           THE WITNESS:  In general?

9           MR. KERTELL:  Yes.

10          THE WITNESS:  My report.  I looked at the

11   entire contents of the hard drive.  Your own expert

12   looked at the entire contents of the hard drive, and we

13   didn't alter anything.

14   BY MR. KERTELL:

15     Q    Any other examples?

16     A    Any other forensic sample I can come up with.

17   FTK from AccessData; X-Ways Forensics' WinHex; Paraben

18   Corporation's P2 eXplorer; Runtime Software's Mount

19   Image Pro.  A lot of forensic software that's designed

20   specifically to look at files without altering anything.

21   That's the purpose of forensics software.

22     Q    Any other examples?

23     A    No.  I mean, I can go through several more if I

24   want to wrack my brain for forensic software, but that's

25   just -- I don't think I'm here to provide an exhaustive

**EXHIBIT 5 - PAGE 80**

ROBERT D. YOUNG - 3/12/2015

```
 1    list of what's out there forensically, but, by

 2    definition, anything that's forensic is not supposed to

 3    be altering.

 4        Q    Any other examples other than forensic

 5    software?

 6        A    I can't provide any list, not off the top of my

 7    head.

 8        Q    Can you provide any others at this time?

 9             THE WITNESS:  Could you repeat -- read it back,

10    I guess.

11             (Record read by Reporter as follows:

12             "QUESTION:  Any other examples other than

13             forensic software?")

14             THE WITNESS:  No.  That was what I just said.

15    BY MR. KERTELL:

16        Q    Why weren't these methods included in your

17    report?

18             MS. CASTO:  Objection; vague and ambiguous.

19             THE WITNESS:  Because they weren't relevant to

20    my opinion.

21    BY MR. KERTELL:

22        Q    Why weren't they relevant to your opinion?

23        A    Because they aren't.  I mean, my opinion is

24    that there's no evidence on the drive that any of the

25    files cited by Dr. Shkel were accessed after that
```

**EXHIBIT 5 - PAGE 81**

ROBERT D. YOUNG - 3/12/2015

Page 144

1    particular date.

2        Q    So you are not providing any opinion that they

3    weren't accessed; correct?

4        A    I've stated my opinion.  That's what it is.

5    I'm not offering any other opinions.

6        Q    You have no opinion whether any of the files

7    that you reviewed were accessed after August 9th, 2011;

8    correct?

9             THE WITNESS:  Could you repeat that.

10            (Record read by Reporter as follows:

11            "QUESTION:  You have no opinion whether any of

12            the files that you reviewed were accessed after

13            August 9th, 2011; correct?")

14            MS. CASTO:  Objection; vague and ambiguous.

15            Which files?

16            THE WITNESS:  That's right.  My questions were

17    there.  Plus, my opinion is that there's no evidence on

18    the drive that they were accessed, so that's it.  I'm

19    offering no other opinions.

20    BY MR. KERTELL:

21        Q    Now, can I have an answer to my question?

22        A    Again, you will have to repeat it.

23            MR. KERTELL:  Can you repeat the question.

24            (Record read by Reporter as follows:

25            "QUESTION:  You have no opinion whether any of '

**EXHIBIT 5 - PAGE 82**

ROBERT D. YOUNG - 3/12/2015

1              the files that you reviewed were accessed after

2              August 9th, 2011; correct?")

3              MS. CASTO:  Objection; vague and ambiguous.

4              Which files?

5              THE WITNESS:  And then that's -- based on that,

6     the answer is that's not correct.

7     BY MR. KERTELL:

8         Q   Why is it not correct?

9         A   Exhibit 2 here is a list of files -- some of

10    the files that were accessed on the hard drive, and I

11    reviewed all the files on the hard drive.

12        Q   I thought you just said that you didn't

13    recognize Exhibit 2.

14        A   I don't.  I'm -- I said the files listed in

15    Exhibit 2.

16        Q   Oh, okay.  Let's go back to Exhibit 2.

17            What files in Exhibit 2 do you remember?

18        A   I don't -- I can't speak Chinese, but the one

19    stated 2011-12-12-ok.mpg, for example, there's a movie

20    that was created in December.  Either accessed -- I

21    can't remember the access date, but it was in December.

22    All these files I recognize as files' names -- names of

23    files that I saw on the hard drives that were among the

24    30 that I mentioned earlier.

25        Q   So you don't have any opinion whether or not

**EXHIBIT 5 - PAGE 83**

ROBERT D. YOUNG - 3/12/2015

```
 1    any of the documents listed in Exhibit 2 of your report

 2    were accessed after August 9, 2011; correct?

 3         A    No, that's not correct.

 4         Q    How is it not correct?

 5         A    My opinion is there's no evidence on the hard

 6    drive that the files were accessed.

 7         Q    And my question is a little different.

 8              My question is:  Is it -- do you have any

 9    opinion whether or not they actually were accessed after

10    August 9th, 2011?

11              MS. CASTO:  Objection; asked and answered.  You

12    have asked this question several times, and he's

13    answered it.

14              MR. KERTELL:  No, he hasn't.

15              THE WITNESS:  I said I'm offering no other

16    opinions at this point.

17              MR. KERTELL:  Can you repeat the question.

18              (Record read by Reporter as follows:

19              "QUESTION:  And my question is a little

20              different.

21              My question is:  Is it -- do you have any

22              opinion whether or not they actually were

23              accessed after August 9th, 2011?")

24              THE WITNESS:  And you are referring

25    specifically to the earlier question, that -- the files
```

**EXHIBIT 5 - PAGE 84**

ROBERT D. YOUNG - 3/12/2015

```
 1    that existed in Exhibit 2?

 2              MR. KERTELL:  Correct.

 3              THE WITNESS:  The answer is no, I don't have

 4    any opinion on that.

 5    BY MR. KERTELL:

 6         Q    Your opinion is strictly limited to that you

 7    didn't find any evidence; correct?

 8         A    That there is no evidence on the drive.

 9         Q    But that evidence would not -- strike that.

10              MS. CASTO:  Counsel, I don't want to interrupt

11    your flow, but we have been going for over two hours, so

12    I just want to check with the witness.

13              MR. KERTELL:  I just want to keep this going

14    for a little bit more.  We can take a break in about

15    five minutes.

16              MS. CASTO:  Well, my question to the witness

17    is:  Are you okay?

18              THE WITNESS:  I'm okay.

19              MS. CASTO:  Okay.

20    BY MR. KERTELL:

21         Q    In paragraph 12 of your report, it says that

22    you examined the timestamp files stored on the image

23    drive; correct?

24         A    Yes.

25         Q    And then it talks about the three timestamp
```

**EXHIBIT 5 - PAGE 85**

ROBERT D. YOUNG - 3/12/2015

1    files:  Created, last written, and last accessed;

2    correct?

3        A   It talks about those, yes.

4        Q   Why did you use the term "these timestamps

5    include"?

6        A   Because there are several other timestamps

7    relevant to the file.

8        Q   And what are those other timestamps?

9        A   There's a "file deleted" timestamp, indicating

10   when the file was deleted.  There is a "entry modified"

11   timestamp that indicates something about the entry

12   related to the file was changed.  I thought there was

13   another timestamp when I was reviewing the attributes

14   that's unrelated to the file.  Has something to do with

15   the system, and I don't recall what that timestamp was.

16   I'm sorry.

17       Q   Okay.  And I think you mentioned earlier using

18   Version 6.19 of EnCase?

19       A   Amongst other versions.  I've also used

20   Version 7.9.  I've used other tools as well, but my

21   primary one is EnCase Version 6.

22       Q   And by default, what timestamps are displayed

23   in that version of EnCase?

24       A   The -- I think your expert referred to as

25   "MACED" or "MACE," the modified, accessed, created,

──── **EXHIBIT 5 - PAGE 86** ────

ROBERT D. YOUNG - 3/12/2015

```
 1   deleted, and entry modified.

 2        Q   Did you examine all those timestamps?

 3        A   Yes.

 4        Q   What is the "entry modified" timestamp?

 5        A   I believe I just stated that a moment ago.

 6   It's basically when a change is made to the file index

 7   entry, or the MFT entry.

 8        Q   And did you include the "entry modified"

 9   timestamp in your report?

10        A   No.

11        Q   Why not?

12        A   Because, by definition, it's when the entry was

13   changed, not the file, but something about the entry.  I

14   liken it to the card catalog to the books in the

15   library.  It is the information on how to find and other

16   information about the particular item, but not the item

17   itself.

18        Q   So you don't think it was relevant to your

19   report; correct?

20        A   That's correct.  By definition, it's not

21   relevant to my opinion because, by definition, it is a

22   record of a change to the entry, not a record of access

23   to the file.

24        Q   For any of the files listed in Exhibit 2 of

25   your report, did you find an "entry modified" timestamp
```

**EXHIBIT 5 - PAGE 87**

ROBERT D. YOUNG - 3/12/2015

1    after August 9th, 2011?

2        A    I don't recall.

3        Q    Did you look at the "entry modified" timestamps

4    of the files?

5        A    Yes.

6        Q    Why?

7        A    Just to look at what was there.  Yeah, just to

8    look at what was there.

9        Q    Just for curiosity?

10        A    Pretty much, to see if there was any relevance,

11    and then the ones I looked at, I glanced at them and

12    didn't see anything that was an anomaly and focused on

13    the ones that were relevant to my opinion.

14        Q    But you don't recall one way or the other

15    whether any of those were dated after August 9th, 2011;

16    correct?

17        A    I know that there were -- dated after

18    August 9th, there were some, yes.

19        Q    Which ones?

20        A    In general or -- I mean, there was the files

21    that were all accessed and created after that period of

22    time.  They had dates after.

23        Q    And what dates were those?

24        A    I don't recall as I sit here.  It was just

25    after August 9th.

**EXHIBIT 5 - PAGE 88**

ROBERT D. YOUNG - 3/12/2015

```
 1       Q    Let's turn to paragraph 1 of your report.

 2            In paragraph 1, you state you were engaged by

 3   counsel for Defendants Bill Nie and Xiamen Niell

 4   Electronics Company, Limited, to examine a forensic copy

 5   of an external hard drive used by Mr. Nie; correct?

 6       A    Yes.

 7       Q    But as we discussed previously, you don't have

 8   any personal knowledge of the forensic copy you examined

 9   was a hard drive ever used by Mr. Nie; correct?

10       A    That's correct.  I do not have any direct

11   knowledge of that.

12       Q    Your conclusions are limited to the hard drive

13   you reviewed, wherever that came from; correct?

14       A    Yes.

15       Q    Why did you state in your report that the hard

16   drive was used by Mr. Nie?

17       A    That's what was represented to me.

18       Q    Was it relevant to your opinion?

19       A    Not really.

20       Q    Did the -- turn to paragraph 9 of your report.

21            It states that you were provided by counsel for

22   Niell Tech with a forensic copy of an external hard

23   drive that I understand was created of a computer hard

24   drive that was in the possession of Mr. Bill Nie, a

25   defendant in this matter.
```

**EXHIBIT 5 - PAGE 89**

ROBERT D. YOUNG - 3/12/2015

```
 1              Did I read that right?

 2       A    Yes.

 3       Q    How did you come to this understanding?

 4       A    That it was represented to me by counsel.

 5       Q    And, again, you have no personal knowledge of

 6    that?

 7              MS. CASTO:  Objection; asked and answered.

 8              THE WITNESS:  That's correct, other than the

 9    caption of the case and names him as a defendant.

10    BY MR. KERTELL:

11       Q    When was it in Mr. Nie's possession?

12       A    I don't know.

13       Q    Why did you state that it was in Mr. Nie's

14    possession?

15       A    The reason I just stated:  It was represented

16    to me that way.

17       Q    Was it relevant to your opinion?

18       A    No.

19       Q    You don't have any personal knowledge as to how

20    many hard drives Mr. Nie had; correct?

21       A    Correct.

22       Q    You also don't know if Mr. Nie had multiple

23    drives containing the same files; correct?

24       A    Yes, that's correct.

25       Q    Your conclusions and opinions are limited to
```

**EXHIBIT 5 - PAGE 90**

ROBERT D. YOUNG - 3/12/2015

 1    just the one forensic image you reviewed; correct?

 2        A    Yes.

 3        Q    You don't have any opinions as to Mr. Nie's

 4    access to any other drives he had other than the one you

 5    reviewed; correct?

 6        A    That's correct.

 7        Q    Or you don't have any opinions as to Mr. Nie's

 8    access to other drives he may have used other than the

 9    one you reviewed; correct?

10            MS. CASTO:  Objection; vague and ambiguous.

11            THE WITNESS:  No, that's not correct.

12    BY MR. KERTELL:

13        Q    And how is it not correct?

14        A    Because neither of the partitions on this

15    external hard drive had a bootable operating system on

16    it, so there's an assumption in there that someone was

17    using a computer with a hard drive in it other than this

18    particular hard drive.

19            MR. KERTELL:  Okay.  Can you repeat the answer,

20    please.

21            (Record read by Reporter as follows:

22            "ANSWER:  Because neither of the partitions on

23            this external hard drive had a bootable

24            operating system on it, so there's an

25            assumption in there that someone was using a

**EXHIBIT 5 - PAGE 91**

ROBERT D. YOUNG - 3/12/2015

1           computer with a hard drive in it other than

2           this particular hard drive.")

3  BY MR. KERTELL:

4      Q    So the hard drive that you examined did not

5  have a bootable operating system; correct?

6      A    Yes, that's what I said.

7      Q    You had to use a separate computer to be able

8  to operate it; correct?

9      A    Who?  The question is ambiguous.  I don't know.

10  Theoretically, you would need to connect it to something

11  else, but I don't know the specific hard drive

12  capabilities.

13      Q    But you don't have any opinions as to Mr. Nie's

14  use of other drives he may have had other than the one

15  you reviewed; correct?

16      A    Other than the one I just stated.  There must

17  have been a computer -- or should have been another

18  computer that it was connected to.

19      Q    Okay.  So Mr. Nie could have had other hard

20  drives that contained the exact same files as you

21  reviewed; correct?

22           MS. CASTO:  Objection; calls for speculation.

23           THE WITNESS:  I don't know.  I have no idea.

24  You just asked those questions.  I have no idea what

25  other drives he had, apart from the one I just

**EXHIBIT 5 - PAGE 92**

ROBERT D. YOUNG - 3/12/2015

```
 1   mentioned, a computer.

 2   BY MR. KERTELL:

 3       Q    But he could have had a second drive that had

 4   the exact same files; correct?

 5            MS. CASTO:  Objection; calls for speculation.

 6            THE WITNESS:  I could guess that he had a

 7   thousand of them.  I mean, I could guess anything.  It's

 8   all just random guesses.

 9   BY MR. KERTELL:

10       Q    And if he had a second drive, what would be the

11   meaning of your opinions?

12            MS. CASTO:  Objection; calls for speculation,

13   beyond the scope of his expert-report testimony.

14            THE WITNESS:  Yeah, it doesn't alter my

15   opinion.

16   BY MR. KERTELL:

17       Q    In paragraph 1, why did you describe one of the

18   plaintiffs in this case as "Meggitt Sensing Systems"?

19       A    That's how I was asked to put it down when I

20   asked, "Who are the plaintiffs and who are the

21   defendants?"  These are the names that were given to me.

22       Q    Okay.  Why would anyone care about the access

23   to the hard drive you reviewed if there were the

24   possibility of other identical hard drives out there in

25   Mr. Nie's possession that you did not review?
```

**EXHIBIT 5 - PAGE 93**

ROBERT D. YOUNG - 3/12/2015

1              MS. CASTO:  Objection; vague and ambiguous,

2       calls for speculation.

3              THE WITNESS:  I can't really answer that.

4       It's -- a "Why would anyone question?" is assuming

5       things that I have no control over or knowledge of why

6       people do things.

7       BY MR. KERTELL:

8          Q   Okay.  Looking at paragraph 9 of your report,

9       you state that Mr. Nie took this external drive when he

10      left the employ of nonparty Meggitt (Xiamen) in August

11      2011; is that correct?

12             MS. CASTO:  Objection; misstates the report.

13             THE WITNESS:  All I have is what's stated, just

14      that he -- it was represented to me that he took this

15      hard drive when he left the employ of Meggitt.

16      BY MR. KERTELL:

17         Q   Okay.  When you say "Meggitt," what do you

18      mean?

19         A   Well, as it says in the report, Meggitt

20      (Xiamen) -- I don't know how to pronounce that, I'm

21      sorry, but that's what I mean.  It just -- that was just

22      the description of how he came to have this drive.

23         Q   Who wrote paragraph 9?

24         A   I did.

25         Q   Okay.  Does it state:  "I understand that

**EXHIBIT 5 - PAGE 94**

ROBERT D. YOUNG - 3/12/2015

```
 1    Mr. Nie took this external drive when he left the employ

 2    of Non-Party Meggitt Xiamen in August 2011"?

 3         A    Yes.

 4         Q    But you have no personal knowledge about that

 5    statement?

 6         A    That's correct.

 7         Q    Why did you include this statement?

 8         A    A descriptive technology of -- descriptive

 9    language of the drive.

10         Q    Was it relevant to your opinion in any way?

11         A    Not really.

12         Q    Why did you state that Meggitt (Xiamen) was a

13    nonparty?

14         A    That's how it was described to me.

15         Q    Did Meggitt (Xiamen), stated as a nonparty,

16    affect your opinion in any way?

17         A    No.

18         Q    Okay.  Looking back at paragraph 1, it states

19    that you were engaged by counsel for Defendants to

20    examine this forensic copy, quote, to determine the most

21    relevant access date for any of the files cited by

22    Mr. Andrei Shkel, expert for Plaintiffs, Meggitt Sensing

23    Systems and Meggitt (Maryland), Inc.," "Meggitt" in

24    quotes, "as containing Meggitt's Trade Secrets"; is that

25    correct?
```

**EXHIBIT 5 - PAGE 95**

ROBERT D. YOUNG - 3/12/2015

```
 1      A    No.

 2      Q    Is it because I left off some punctuation?

 3      A    No.  You said "relevant" as opposed to

 4  "recent."

 5      Q    Okay.

 6      A    It was the most recent access date.

 7      Q    Okay.  And we have established you have never

 8  looked at any of Professor Shkel's reports; correct?

 9           MS. CASTO:  Objection; asked and answered

10  repeatedly.

11           THE WITNESS:  That's correct.

12  BY MR. KERTELL:

13      Q    And Professor Shkel doesn't cite any files;

14  correct?

15           MS. CASTO:  Objection; vague and ambiguous,

16  calls for speculation.

17           THE WITNESS:  I don't know.

18  BY MR. KERTELL:

19      Q    Okay.  You don't know whether he cites files or

20  documents?

21           MS. CASTO:  Objection; vague and ambiguous.

22           THE WITNESS:  I don't know what he cites

23  specifically.  I have not read his report.

24  BY MR. KERTELL:

25      Q    Okay.  And you have no personal knowledge about
```

**EXHIBIT 5 - PAGE 96**

ROBERT D. YOUNG - 3/12/2015

Page 159

```
 1    whether the list provided to you by counsel for

 2    Defendants was complete; correct?

 3            MS. CASTO:  Objection; asked and answered.

 4            THE WITNESS:  That's correct.

 5    BY MR. KERTELL:

 6        Q    Turning to paragraph 11 of your report, who

 7    wrote paragraph 11?

 8        A    I did.

 9        Q    What were those hash values that you were

10    provided?

11        A    The ones in the spreadsheets we have just

12    discussed, plus the missing one, I'm assuming.

13        Q    And how were those hash values determined, if

14    you know?

15            MS. CASTO:  Objection; asked and answered.

16            THE WITNESS:  It was represented to me they

17    were calculated from the production copies of the

18    documents.

19    BY MR. KERTELL:

20        Q    Why were your opinions limited to the -- to a

21    time frame after August 9th, 2011?

22            MS. CASTO:  Objection; misstates his opinions,

23    vague and ambiguous.

24            THE WITNESS:  They weren't.

25    BY MR. KERTELL:
```

**EXHIBIT 5 - PAGE 97**

ROBERT D. YOUNG - 3/12/2015

1       Q    How were they not limited to the time frame

2   after August 9th, 2011?

3           MS. CASTO:  Your question --

4           THE WITNESS:  Because I considered all the

5   files on the hard drive.

6   BY MR. KERTELL:

7       Q    But your opinion is only limited to access

8   after August 9th, 2011; correct?

9       A    For documents identified by Dr. Shkel, none of

10  those files have evidence that they were accessed after

11  August 9th.

12      Q    And why did you pick the date August 9th, 2011?

13          MS. CASTO:  Objection; asked and answered.

14          THE WITNESS:  I didn't pick it.  It's the date

15  that was in the documents.  It was in the dates that was

16  in the file.

17  BY MR. KERTELL:

18      Q    Okay.  So did you find significant access to

19  those documents prior to August 9th, 2011?

20      A    I did not review it for that.  It's not part of

21  my opinion.

22          MS. CASTO:  Objection; vague and ambiguous.

23          What does "significant access" mean?

24  BY MR. KERTELL:

25      Q    You just said that it's not part of your

**EXHIBIT 5 - PAGE 98**

ROBERT D. YOUNG - 3/12/2015

1    opinion what occurred -- what access occurred after

2    August 9, 2011; correct?

3        A    Yes.

4        Q    Why don't you have any opinion as to what

5    occurred prior to August 9th, 2011?

6        A    I was not asked to determine what access

7    occurred prior to a given period or what was the

8    earliest or level of access to any file.

9        Q    So what were you asked to do?

10       A    I was engaged by counsel for Defendant Bill Nie

11   and Xiamen Niell Electronics to examine a forensic copy

12   of an external hard drive.

13       Q    You just said that you weren't asked to look at

14   access prior to August 9th, 2011.  That was your

15   testimony, was it not?

16       A    I wasn't asked to access -- to determine the

17   access of any file or pattern of access to any file, any

18   file, other than the last time it was accessed.

19           MS. CASTO:  So I think we are at a point where

20   we need to take a break.  We have gone for about two and

21   a half hours.

22           MR. KERTELL:  Yeah, just give me two minutes.

23           MS. CASTO:  You asked for five minutes half an

24   hour ago.

25           MR. KERTELL:  No, no.

**EXHIBIT 5 - PAGE 99**

ROBERT D. YOUNG - 3/12/2015

1      Q    Do you know when Mr. Nie started doing work for

2    Niell-Tech?

3      A    No.

4           MS. CASTO:   Objection; asked and answered.

5    BY MR. KERTELL:

6      Q    Why didn't you ask?

7           MS. CASTO:   Objection; asked and answered.

8           THE WITNESS:   It wasn't relevant to my opinion.

9    BY MR. KERTELL:

10     Q    There was access to the documents set forth in

11   Exhibit 2 to your report prior to August 9, 2011;

12   correct?

13     A    Yes.

14     Q    And there was significant access to several of

15   those -- sorry, take it back.

16          There was access to a large number of those

17   documents in the days and weeks preceding August 9,

18   2011; correct?

19          MS. CASTO:   Objection; vague and ambiguous.

20          THE WITNESS:   I can't answer significant versus

21   not significant.  There is access prior to August 9th.

22   BY MR. KERTELL:

23     Q    And within the preceding year, virtually at

24   least 50 percent of the documents listed in your

25   Exhibit 2 were accessed or created; correct?

**EXHIBIT 5 - PAGE 100**

ROBERT D. YOUNG - 3/12/2015

1          MS. CASTO:  Objection; vague and ambiguous.

2          THE WITNESS:  I did not do any analysis for

3    patterns of creation or access to any file prior to --

4    BY MR. KERTELL:

5       Q   I'm not asking about patterns, I'm asking:

6    Were there significant -- were many of these documents

7    accessed just prior to August 9, 2011?

8          MS. CASTO:  Objection; vague and ambiguous.

9          THE WITNESS:  I already stated I can't answer

10   that because I would have to go through and look at

11   these all independently, and I've not done that.

12         MS. CASTO:  Counsel, it's been two minutes.

13         MR. KERTELL:  Okay.  Just two more questions.

14      Q   You don't know if Mr. Nie had any hard copies

15   of any of the documents listed in Exhibit 2, do you?

16         MS. CASTO:  Objection; calls for speculation.

17         THE WITNESS:  No.

18   BY MR. KERTELL:

19      Q   And nothing that you have said or any of your

20   opinions means that Mr. Nie did not have hard copies of

21   these documents; correct?

22         MS. CASTO:  Objection; calls for speculation.

23   It lacks foundation.

24         THE WITNESS:  I have no opinion as to -- or

25   knowledge of what Mr. Nie had or did not have.

**EXHIBIT 5 - PAGE 101**

ROBERT D. YOUNG - 3/12/2015

Page 164

```
 1            MR. KERTELL:  Okay.

 2            MS. CASTO:  Thank you.

 3            (Recess taken from 3:24 to 3:34 p.m.)

 4   BY MR. KERTELL:

 5       Q   Okay.  Please turn to paragraph 20 of your

 6   report.

 7            Okay.  Who wrote paragraph 20?

 8       A   I did.

 9       Q   In reaching your conclusion that there was no

10   evidence of access, did you rely on anything other than

11   the three timestamps you discuss in paragraph 20?

12       A   No.

13       Q   So your opinion really is that you didn't find

14   any of the timestamps you looked at were modified after

15   August 9th, 2011; correct?

16       A   Yes; that I did not find any evidence of access

17   on the drive.

18       Q   Based on those three timestamps alone; correct?

19            MS. CASTO:  Objection; misstates his testimony.

20            THE WITNESS:  I'm trying to recall if there was

21   any other specific item, but the consistency of

22   everything, that's the basis for my opinion.

23   BY MR. KERTELL:

24       Q   And I think we have discussed, but just to

25   clarify, you didn't consider the "entry modified"
```

**EXHIBIT 5 - PAGE 102**

ROBERT D. YOUNG - 3/12/2015

Page 165

1    timestamp at all; correct?

2           MS. CASTO:  Objection; asked and answered.

3           THE WITNESS:  I looked at it, but by

4    definition, it's access to the entry -- changed to the

5    entry and not access to the data.

6    BY MR. KERTELL:

7       Q    Was there evidence on the drive you looked at

8    that files were accessed after August 9th, 2011?

9           MS. CASTO:  Objection; asked and answered.

10          THE WITNESS:  No.

11   BY MR. KERTELL:

12      Q    Did several PST files have "entry modified"

13   timestamps on May 30th, 2015?

14      A    Yes.

15      Q    Which PST files were those?

16      A    I don't recall the names.  They were the ones

17   cited in your expert's report.

18      Q    And why would those "entry modified" timestamps

19   change on May 30th, 2015?

20          MS. CASTO:  Objection; calls for speculation.

21          THE WITNESS:  I don't know.  By definition, it

22   is the change -- any change to the entry, not the data,

23   and so because there's so many reasons that an entry can

24   change, I do not know why.

25   BY MR. KERTELL:

**EXHIBIT 5 - PAGE 103**

ROBERT D. YOUNG - 3/12/2015

```
 1   period, but, no, I don't know what they did with the
 2   drive in mid-May.
 3       Q   Do you know who at Morgan, Lewis had knowledge
 4   that the firm had this drive in mid-May 2014?
 5           MS. CASTO:  Objection; calls for speculation.
 6           THE WITNESS:  No.
 7   BY MR. KERTELL:
 8       Q   Do you know when Morgan, Lewis first made
 9   Meggitt -- sorry.
10           Do you know when Defendants first made Meggitt
11   aware that a hard drive existed?
12       A   No.
13       Q   Okay.  As we discussed, paragraph 12 of your
14   report talks about the "file created," "last written,"
15   and "last accessed" timestamps; correct?
16       A   Yes.
17       Q   Okay.  Looking at paragraph 13 of your report,
18   who wrote paragraph 13?
19       A   I did.
20       Q   Does paragraph 13 state:  "These timestamps can
21   be used to determine whether a file on a hard drive has
22   been accessed, whether such access was simply to open
23   and view the contents of the file, or to copy the
24   contents of a file to another computer"?
25       A   Yes.
```

**EXHIBIT 5 - PAGE 104**

ROBERT D. YOUNG - 3/12/2015

1      Q     That statement's inaccurate; right?

2            MS. CASTO:  Objection; argumentative.

3            THE WITNESS:  Not to my knowledge.

4    BY MR. KERTELL:

5      Q     Are you just referring -- which timestamps are

6    you referring to in paragraph 13?

7      A     These timestamps, the aforementioned timestamps

8    in paragraph 12.

9      Q     The three of them; correct?

10     A     Yes.

11     Q     Can you determine if a file's been copied just

12   by looking at these three timestamps?

13     A     No.

14     Q     One can use a computer running Windows Vista

15   operating system and copy the file on an external hard

16   drive without changing any of these three timestamps in

17   your report; correct?

18           MS. CASTO:  Objection; calls for speculation,

19   lacks foundation.

20           THE WITNESS:  I don't know.  That's not my

21   experience.

22   BY MR. KERTELL:

23     Q     Have you ever tried copying a file using

24   Windows Vista OS and examining the three timestamps in

25   your report?

**EXHIBIT 5 - PAGE 105**

ROBERT D. YOUNG - 3/12/2015

1           MS. CASTO:  Objection; vague and ambiguous.

2           THE WITNESS:  Not recently.  I've copied files

3    with Windows Vista, but I haven't done it forensically

4    for a period of time -- some period of time.

5    BY MR. KERTELL:

6       Q    Could Mr. Nie have used Windows Vista to copy a

7    file from the external hard drive you reviewed to

8    another medium without changing any of the three

9    timestamps mentioned in your report?

10          MS. CASTO:  Objection; calls for speculation.

11          THE WITNESS:  That's what it would be, is

12   speculation.  I don't know.  I don't know Mr. Nie's

13   technical capabilities.  I don't know what he had,

14   didn't have.

15   BY MR. KERTELL:

16      Q    Okay.  Could somebody using Windows Vista

17   operating system copy a file from the external hard

18   drive you reviewed without changing any of the three

19   timestamps in your report?

20          MS. CASTO:  Objection; calls for speculation.

21          THE WITNESS:  Could anybody?  Somebody?  I

22   could have done it with the tools I have, yes, using

23   Windows Vista.

24   BY MR. KERTELL:

25      Q    So you could have copied the files running

**EXHIBIT 5 - PAGE 106**

ROBERT D. YOUNG - 3/12/2015

1    Windows Vista operating system from the hard drive you

2    examined to another medium without changing any of the

3    three timestamps in your report?

4         A    Using the tools I have, yes.  Using EnCase,

5    various other -- write blockers, any technology that I

6    can use.  I do it all the time.  For a while, I was

7    running Windows Vista for my examination machine, so I

8    know that I did copies of files.

9         Q    Could you do it without using any forensic

10   software?

11             MS. CASTO:  Objection; calls for speculation.

12             THE WITNESS:  I don't know.

13   BY MR. KERTELL:

14        Q    Wouldn't that be an important question to ask

15   when determining whether -- offering an opinion whether

16   there's any evidence of a file being copied?

17             MS. CASTO:  Objection; lacks foundation.

18             THE WITNESS:  It's also not relevant to my

19   opinion.

20   BY MR. KERTELL:

21        Q    Is your opinion just limited to seeing access,

22   not seeing Mr. Nie didn't actually copy any files;

23   correct?

24             MS. CASTO:  Objection; argumentative.

25             THE WITNESS:  My opinion is that there's no

**EXHIBIT 5 - PAGE 107**

ROBERT D. YOUNG - 3/12/2015

1    evidence on the drive that any of the files identified

2    by Dr. Shkel were accessed.

3    BY MR. KERTELL:

4        Q    But those files could be accessed without use

5    of forensic software without changing any of the

6    timestamp dates; correct?

7             MS. CASTO:  Objection; calls for speculation.

8             THE WITNESS:  Yeah, we went over all this this

9    morning.  I don't recall.  I know forensic software can

10   do it.  I don't recall whether or not nonforensic

11   software has options to do that or certain versions of

12   Windows do certain things, yeah.  I mean, that's

13   basically it.

14   BY MR. KERTELL:

15       Q    Can one use a computer running Windows 7

16   operating system and copy a file from the hard drive you

17   examined without changing any of the three timestamps in

18   your report?

19            MS. CASTO:  Objection; calls for speculation.

20            THE WITNESS:  I don't know.

21   BY MR. KERTELL:

22       Q    Why don't you know?

23       A    Because I haven't tried it recently.

24       Q    Have you ever tried it?

25       A    I've copied files, but I haven't -- I don't

**EXHIBIT 5 - PAGE 108**

ROBERT D. YOUNG - 3/12/2015

1    recall focusing on the specific dates.  I was looking at

2    access to files, and in those cases -- in cases -- I've

3    had several dealing with Windows 7 files that have been

4    accessed and the updated dates changed.

5            MR. KERTELL:  Okay.  I would like to mark, as

6    Exhibit 8, an expert report that's been submitted in

7    this case from Ms. Smith.

8            (Exhibit 8 was marked for identification by the

9            Reporter.)

10   BY MR. KERTELL:

11       Q   Mr. Young, have you seen this report before?

12       A   Yes.

13       Q   Have you reviewed its contents?

14       A   Yes.

15       Q   Do you disagree with any of the statements or

16   opinions set forth in paragraph 1 of this report?

17           MS. CASTO:  Objection; calls for speculation.

18           THE WITNESS:  I have no opinion one way or the

19   other about the statements in paragraph 1.  I have no

20   personal knowledge.

21   BY MR. KERTELL:

22       Q   Okay.  Do you disagree with any of the

23   statements or opinions set forth anywhere in this

24   report?

25           MS. CASTO:  Objection; vague and ambiguous.

**EXHIBIT 5 - PAGE 109**

```
 1                    CERTIFICATE OF REPORTER

 2         I, RACHEL FERRIER, a Certified Shorthand

 3    Reporter, hereby certify that the witness in the

 4    foregoing deposition was by me duly sworn to tell the

 5    truth, the whole truth, and nothing but the truth in the

 6    within-entitled cause;

 7              That said deposition was taken down in

 8    shorthand by me, a disinterested person, at the time and

 9    place therein stated, and that the testimony was

10    thereafter reduced to typewriting by computer under my

11    direction and supervision and is a true record of the

12    testimony given by the witness;

13              That before completion of the deposition,

14    review of the transcript [X] was [ ] was not requested.

15    If requested, any changes made by the deponent (and

16    provided to the reporter) during the period allowed are

17    appended hereto.

18              I further certify that I am not of counsel or

19    attorney for either or any of the parties to the said

20    deposition, nor in any way interested in the event of

21    this cause, and that I am not related to any of the

22    parties thereto.

23         DATED: March 26th, 2015

24

25         RACHEL FERRIER, CSR No. 6948
```

**EXHIBIT 5 - PAGE 110**